William G. H. Finch & Elsie G. Finch v. Commissioner.
Finch v. Commissioner
Docket No. 107731.
United States Tax Court
1942 Tax Ct. Memo LEXIS 46; 1 T.C.M. (CCH) 191; T.C.M. (RIA) 42641; December 10, 1942
*46 During the taxable year petitioner and another cancelled a contract between them and executed a new one under the terms of which petitioner received $29,000 in cash and property of the value of $4,000. Held, the cash and property constituted ordinary income, rather than capital gain from the disposition of rights under the prior contract. David Schnitzer, C.P.A., for the petitioner. Thomas Charshes, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The petitioners have asked for a redetermination of the deficiency found by the respondent in the amount of $2,633.86 for the calendar year 1938. The main issue is whether cash in the sum of $29,000 and property of the value of $4,000 constitute ordinary income and are taxable as such or are capital gain. The facts have been stipulated by the parties and we will set them forth in such detail as is necessary to present the questions in issue. Findings of fact Petitioners, husband and wife, reside in New York and filed their joint return for the taxable year with the Collector for the third district of New York. The income in question is that of the husband. Finch is an engineer who has been engaged for many years *47 with developments in and inventions of facsimile communications systems, i.e., the transmission over radio, telephone or wire circuits of any material that can be recorded on paper, such as writing, printing, drawing, maps, charts, and photographs. An exact copy or facsimile of the material transmitted is reproduced and recorded by the receiving apparatus. In September 1935 Finch had developed a system of facsimile communications suitable for newspaper work, which it was believed had commercial application and by this time he had obtained nine patents in this field and had others pending. William Randolph Hearst and the Hearst Organization through Hearst Radio, Inc., had for many years been interested in this development and in September 1935 the Hearst Organization agreed to finance Finch in the general development of his inventions in exchange for exclusive licenses to use his patents in the newspaper field. A formal contract was entered into on September 18, 1935 between Finch and Hearst Radio, Inc., under which Finch agreed to render to Hearst Radio, Inc., his exclusive services in connection with all radio activities of that company for a period from September 18, 1935 to September *48 17, 1940 and by the contract granted to Hearst Radio, Inc., and any other Hearst Corporation, a license to make and use apparatus in connection with news rights under the Finch patents. These rights were to run for the term of the patents and no royalties were payable for their use in certain designated cities and for use elsewhere a ten per cent royalty was to be paid. Among other things Hearst Radio, Inc., agreed to furnish a laboratory in which Finch might prosecute his work, and two engineering assistants, and in fact spent the sum of $155,550.36 for experimental and development work on the Finch patents and inventions during the periods from September 15, 1935 to May 1, 1938. Hearst Radio, Inc., was to pay Finch $15,000 per annum "as full and complete compensation for royalties under the licenses herein granted, and for laboratory and personal services." In September 1935 Finch organized a company known as Finch Tele-communications, Inc., and from time to time thereafter assigned to it his patents and patent applications subject, however, to his contract with Hearst Radio, Inc. This new company from the time of its organization remained inactive. On May 1, 1938 a new contract *49 was entered into between Finch and Hearst Radio, Inc., in which the parties agreed to cancel their agreement of September 18, 1935 in its entirety. By the new contract Finch granted to Hearst Radio, Inc., and to other Hearst Corporations "the irrevocable and royalty-free right and licenses (without the right to sublicense), * * * under the said Finch patents and inventions, for the transmission and reception of news and pictures for newspaper publication * * *." The contract further provided that Finch would render advisory and consulting services up to September 18, 1940 in connection with the transmission and reception of news and so forth, and in respect to the use, development and maintenance of the machinery, but the time required of Finch was not to exceed, in the aggregate, one business day and month, nor was the number of calls upon his time to exceed two per month. "The sums to be paid to Finch as hereinafter provided shall, however, be received by Finch as payment in full for his advisory and consulting services." The contract relieved the Hearst Organization of all liability in connection with litigation over the Finch patents and contained the mutual release of claims. *50 Paragraph 13 of the contract reads as follows: Upon the execution and delivery of this Agreement, Radio shall pay Finch the sum of Fifteen thousand Dollars ($15,000) in cash; and shall pay Finch the following further sums on the following dates: on the first days of June, 1938 to March, 1939, inclusive, the sum of Two thousand Dollars ($2,000); on May 1, 1939 the sum of Twenty-five thousand Dollars ($25,000); and on May 1, 1940 the sum of Thirteen thousand five hundred Dollars ($13,500); provided, however, that in lieu of the foregoing payments, Radio may at its option make payment in full to Finch in any one of the following ways: (1) Fifteen thousand Dollars ($15,000) on the execution and delivery of this Agreement, Two thousand Dollars ($2,000) on June 1, 1938, and Forty-nine thousand Dollars ($49,000) in cash on or before July 1, 1938; (2) Fifteen thousand Dollars ($15,000) in cash on the execution and delivery of this Agreement, Two thousand Dollars ($2,000) on the first days of June and July, 1938, and Forty-eight thousand five hundred Dollars ($48,500) on or before August 1, 1938; (3) Fifteen thousand Dollars ($15,000) in cash on the execution and delivery of this Agreement, *51 Two thousand Dollars ($2,000) on the first days of June, 1938 to March, 1939, inclusive, and Thirty-six thousand Dollars ($36,000) on or before May 1, 1939. Finch agrees to accept said sums as payment in full for the services to be rendered and the licenses, rights and privileges hereby granted by Finch to the Hearst Corporations. Pursuant to the terms of the contract of May 1, 1938, Finch received in the taxable year 1938, the sum of $29,000 in cash and title to machinery and equipment of the agreed value of $4,000. On the joint income tax return filed by Finch and his wife the cash payment of $29,000 was reported as proceeds from the sale or exchange of capital assets held more than two years. Only 50 per cent, $14,500, was reported as taxable income. The amount of $4,000 representing the agreed value of the machinery and equipment was not reported as income. Opinion ARUNDELL, J.: Respondent has determined that the cash in the sum of $29,000 and property of the value of $4,000 received by petitioner under the terms of the contract of May 1, 1938 constitute ordinary income and his proposed deficiency is based on that finding. The petitioner reported the cash as receipts from the *52 sale of a capital asset and takes the view that the value of the property should not be returned at this time, but upon its sale or other disposition the proceeds should then be returned. Petitioner's argument is that the contract of May 1, 1938 under which the payments were made was entered into solely to settle the rights and obligations arising under the original contract of September 18, 1935. The earlier contract contained a provision that the Hearst Organization (hereinafter sometimes called Hearst) would furnish Finch an appropriate laboratory and two assistants for the purpose of prosecuting his experiments and Hearst did, in fact, spend approximately $155,000 to this end during the period from September 18, 1935 to May 1, 1938. This contract right to have furnished him a laboratory Finch claims is a capital asset which in effect was sold to Hearst when there was omitted from the later contract the obligation that a laboratory be provided for the experiments. There are two reasons why we think there is no merit in the petitioner's argument. In the first place the stipulated facts do not establish that the sums in question or any part of them were paid in lieu of the obligation *53 of Hearst Radio, Inc., to finance petitioner's laboratory experiments. As far as the record discloses it may well be that both parties to the contract wanted to be relieved; Hearst to be relieved of the financial burden; and petitioner relieved of the giving of his time to the laboratory work. If we accept petitioner's view that some portion of the sums paid were to relieve the Hearst Organization of this obligation, we are still of the opinion that the discharge of the obligation was not the purchase of a capital asset. Assuming that the contract right was property in the hands of Finch, it was not property in the hands of the Hearst Organization, but an obligation. It was not sold - it was extinguished. It was not an exchangeable asset to Hearst. In Bingham v. Commissioner ( C.C.A. 2, 1939), , the court held there was no sale or exchange of a capital asset when the maker of promissory notes procured their cancellation by deeding back the mortgaged property: * * * It was, therefore, no sale of the notes to him (the maker) * * * and no exchange of assets for assets since the notes could not, as assets survive the transaction. That *54 being so, such a settlement as the one which this petitioner (the creditor) made involved neither a sale nor an exchange. In , the taxpayer's contention that the money received for the cancellation and release of a lease obligation represented capital gain was denied. The same conclusion was reached in , where the Supreme Court held that "Payment and discharge of a bond is neither sale nor exchange within the commonly accepted meaning of the words." Settlement of a note for less than its face value has been held not to be a sale or exchange and is not a capital loss. . Granting that the obligation of Hearst to furnish a laboratory was an asset of value in the hands of Finch that might have been sold to a third person, cf. , aff'd ; , there was no sale of the asset here, but a mere extinguishment of the *55 obligation. The argument that the property should not be included as ordinary income of the value of $4,000 is without merit. The respondent has found that it had a market value of $4,000 and it was accepted by Finch at the agreed value of $4,000 from Hearst. No evidence was offered that this was not its fair market value. Respondent is sustained in its inclusion in taxable income. The disposition of the main issue makes it unnecessary to consider alternative questions. Decision will be entered under Rule 50.